## CIRCUIT COURT OF FAIRFAX COUNTY

Decisive Analytics Corp.

v.

Ragina M. Chikar et al.

July 15, 2008

Case No. CL 2008-6171

BY JUDGE RANDY I. BELLOWS

The present motion before the Court is Defendants' Motion to Compel Arbitration. On June 13, 2008, the Court heard oral argument on this motion, following which the Court took the matter under advisement. For the reasons stated below, the Defendants' Motion to Compel Arbitration is granted in its entirety.

### I. *Background*

On May 9, 2008, Plaintiff Decisive Analytics Corporation (hereinafter "DAC"), a Delaware corporation operating as a small business in Virginia, filed a complaint against six individual defendants. These defendants include Defendant B2C, Inc., a terminated Virginia corporation (hereinafter "B2C"), defendants Ragina M. Chikar and Michelle D. Brantley, in their individual capacities as sole officers of the former B2C, as well as in their capacities as trustees in liquidation (hereinafter "Brantley Trustee" and "Chikar Trustee") of B2C. In addition, the complaint names Defendant Walter Cotton, III, trading as Management Resources International Trust (hereinafter "Cotton"). Walter Cotton is Defendant Brantley's husband. (Compl. ¶ 8.) The present lawsuit stems from a contract (hereinafter "Prime Contract") between the Undersecretary of Defense, a U.S. Department of Defense official, and B2C.

DAC, in turn, served as a subcontractor to B2C under the Prime Contract. Compl. ¶ 1. At the core of DAC's complaint, which seeks both equitable and legal relief against Defendants, is the allegation that B2C and its related Defendants stole $169,116.42 out of the total $198,648.82 "entrusted to them by the Undersecretary of Defense, which was to be paid promptly to DAC as a small business protected by the U.S. Government." Compl. ¶ 1.

Relevant facts alleged include the following. On September 18, 2006, B2C and DAC entered into a subcontract, attached as Exhibit 1 to the Complaint (hereinafter "Subcontract"). Defendant Chikar signed the Subcontract for Defendant Brantley, in Brantley's capacity as President and CEO of B2C. Clause H of the Subcontract contains an arbitration provision which states as follows:

> H. *Arbitration.* In the event of dispute arising between the parties which cannot be resolved by good faith negotiations, upon 45 days prior written notice by either party, the dispute shall be submitted to arbitration. Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association existing at the time of submission by three arbitrators, one of whom shall be selected by B2C, one of whom shall be selected by Subcontractor, and the other by the American Arbitration Association. The costs of the actual arbitration activity shall be assumed and paid one-half by B2C and one-half by Subcontractor, but the individual costs and expenses of each party (including travel costs and attorney's fees) shall be assumed and paid by the party incurring the costs. Any arbitration shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction. Any arbitration hearing shall take place in Alexandria, Virginia.

Pursuant to the Prime Contract, B2C was to "serve as a pass through, through which work performed by DAC as Subcontractor under the Subcontract, would directly be used by and would directly benefit the Undersecretary of Defense." (Compl. ¶ 24.) The Undersecretary of Defense was to pay B2C, as the prime contractor, a " 'pass through fee' to cover the costs of performing pass through services and properly administering the DAC Subcontract, as well as an additional amount to allow B2C a profit on the work DAC performed under the Subcontract." (Compl. ¶ 25.) In addition, the Undersecretary of Defense would pay B2C, intending that B2C would serve as

a "lockbox for specific funds to be remitted promptly by B2C to DAC, with B2C serving as a trustee and as a fiduciary with respect to [the specific] funds, for the benefit of DAC." (Compl. ¶ 27.) DAC further alleges that it "fulfilled all of its requirements under the Subcontract," in that "[a]ll deliverables[1] that DAC was required to produce were in fact produced to the satisfaction of the Undersecretary of Defense and B2C." (Compl. ¶ 31.)

During the first three months of the Subcontract, B2C properly "remitted to DAC the payments received by B2C from the Undersecretary of Defense for the first three invoices." These were the invoices issued by DAC for B2C to, in turn, submit to the Undersecretary of Defense. (Compl. ¶ 33.) Subsequently, however, DAC alleges that, beginning on December 15, 2006, DAC issued a series of eleven invoices to B2C that were submitted to Chikar's attention and were paid to B2C by the Undersecretary of Defense, but then were never ultimately paid to DAC. DAC alleges that this is because the Defendants kept the funds for themselves.

In addition, DAC alleges that, on July 2, 2007, the Virginia State Corporation Commission automatically terminated B2C's corporate existence due to B2C's failure to file its annual report as required by the Virginia Stock Corporation Act. (Compl. ¶ 55.) DAC states that "B2C intentionally withheld from DAC the fact that, on July 2, 2007, the Virginia State Corporation Commission automatically terminated the corporate existence of B2C." (Compl. ¶ 75.) Following this automatic termination, "[B2C's] properties and affairs automatically passed to Brantley and Chikar, its directors, as trustees in liquidation." (Compl. ¶ 93.) In addition, although the exact timeframe is not clear, at some point Chikar, Brantley, and Cotton are alleged to have informed DAC that B2C was "being merged into Cotton's business, Management Resources International Trust," and that "all assets and liabilities were transferred to Cotton." (Compl. ¶ 112.) Cotton is further alleged to have stated to DAC that "his business was assuming B2C's liability to its creditor, DAC." (Compl. ¶ 112.)

Counts I through V of the Complaint seek equitable relief. Count I (Accounting) seeks "an equitable accounting . . . of all funds that came into the hands of any one or more of the[] Defendants from August 1, 2006, to the present." (Compl. ¶ 121.) Count II (Imposition of Constructive Trust) asks that a constructive trust be imposed of the $169,116.42 that Plaintiff claims "has been defalcated, converted, and taken by one or more of these Defendants." (Compl. ¶ 127.) Count III (Setting Aside Fraudulent

---

[1] The Complaint does not specify the actual nature of these "deliverables."

Conveyance Pursuant to § 55-80) asks that this Court "set aside [the] said fraudulent conveyance or conveyances," of one or more of the Defendants, and "[t]hat these funds be located, specifically traced, accounted for, and sequestered," and that these funds be turned over to Plaintiff. (Compl. ¶ 133.) Count IV (Setting Aside Voluntary Conveyance Pursuant to § 55-81) alleges that one or more of the Defendants transferred "by gift, or conveyance, or assignment, or transfer of, or charge upon," a portion of the $169,116.42 in violation of Va. Code § 55-81. Count V (Piercing the Corporate Veil) seeks relief against all Defendants except Cotton and alleges various acts and omissions of Defendants that justify piercing the B2C corporate veil.

Counts VI through XVII seek legal relief. Counts VI through XI are filed against all Defendants except Cotton and include Breach of Fiduciary Duty (Count VI), Conversion (Count VII), Wrongful Taking of Funds (Count VIII), Fraud (Count IX), Constructive Fraud (Count X), and Negligence (Count XI). Counts XII and XIII (Breach of Contract and Open Account) seek relief against Defendants Chikar Trustee, Brantley Trustee, and B2C. Count XIV (Unlawful Distribution) seeks relief against Chikar and Brantley, and Count XV seeks relief solely against Cotton, on the grounds that Cotton made various false and fraudulent misrepresentations to DAC. Counts XVI and XVII (Statutory Business Conspiracy and Common Law Conspiracy) were filed against Defendants Cotton, Brantley, and Brantley Trustee.

## II. *Parties' Positions*

Defendants argue that, pursuant to Va. Code § 8.01-577 and 8.01-581.01, when parties, such as those in the case at bar, "agree to submit controversies arising out of a written contract to arbitration, that agreement is valid, enforceable, and irrevocable, except upon such grounds as exist at law or in equity for the revocation of any contract." (Defs.' Mot. to Compel Arbitration at 3.) Defendants argue that all of Plaintiffs claims "arise under the Subcontract," and, therefore, pursuant to Va. Code § 8.01-581.02(A), this Court must order all the parties before it to proceed to arbitration. In addition, Defendants argue that, once this Court orders the parties to proceed to arbitration, the Court should then stay this litigation, pursuant to Va. Code § 8.01-581.02(D), which states, "Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section." This provision further states: "However, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include the stay." Va. Code Ann. § 8.01-581.02(D) (LexisNexis 2008).

Plaintiff, however, argues that it has sued six individual defendants, only one of which, B2C, was even a party to the Subcontract with DAC, which means that any arbitration provision within the Subcontract can only potentially apply to B2C. Plaintiff states that "[t]o be compelled to arbitrate, the parties involved must be parties to a contract containing an arbitration clause," and that, "in order to enforce an arbitration agreement against a non-signatory to an arbitration clause, the non-party can only be bound under principles of contract law, including agency, a third-party beneficiary theory, or assignment." (Pl.'s Opp. at 4.) Plaintiff argues that Brantley, Brantley Trustee, Chikar, Chikar Trustee, and Cotton "are not third-party beneficiaries of the Subcontract, B2C is not their agent, and there is no assignment of rights or delegation of duties to which DAC and B2C agreed," so, thus, any arbitration agreement cannot be enforced against them. (Pl.'s Opp. at 4.)

Further, Plaintiff argues that arbitration should not be ordered in regard to claims against B2C, because "[n]o factual dispute exists between Plaintiff and B2C." (Pl.'s Opp. at 4.) Essentially, Plaintiff argues that its claims against B2C are not, for the most part, "contractual" claims, and thus are not subject to the Subcontract's arbitration clause. This is because, in Plaintiff's opinion, "B2C never has, does not, and could not contest the fact that the entire amount is owing under the Subcontract," and thus "[t]here is no dispute under the Subcontract whatsoever as there is not a scintilla of breach or impropriety by DAC." (Pl.'s Opp. at 2.)

Finally, Plaintiff argues that the two contract claims that could presumably be sent to arbitration under the terms of the Subcontract, Counts XII and XIII, are "incidental," and thus since "the non-arbitrable claims dominate and the arbitrable claims are incidental, a stay should not be ordered." (Pl.'s Opp. at 5.) Plaintiff asserts that "[t]he determination whether to stay non-arbitrable claims lies within the discretion of the trial court to control its docket," and "[t]he balance between arbitrable and non-arbitrable claims should guide the trial court's discretion." (Pl.'s Opp. at 5 (citing *S. A. Mineracao da Trindade-Samitri v. Utah Int'l*, 745 F.2d 190, 196 (2d Cir. 1984))).

### III. *Analysis*

A. *Applicable Law*

1. *Virginia Law*

The instant motion presents issues that appear to be novel questions under Virginia law, including (1) whether non-signatories to a contract can compel arbitration pursuant to that contract, and (2) whether the scope of a

contract's arbitration clause can encompass not only allegations of breach of that contract, but also intentional torts related to that contract, even when the resolution of the intentional torts does not depend upon a construing or application of a specific provision within the contract. Neither party cites a Virginia case precisely on point, nor is the Court aware of any such case.

Pursuant to Va. Code § 8.01-577(B), when parties enter into an arbitration agreement:

> [n]either party shall have the right to revoke an agreement to arbitrate except on a ground which would be good for revoking or annulling other agreements. Submission of any claim or controversy to arbitration pursuant to such agreement shall be a condition precedent to institution of suit or action thereon, and the agreement to arbitrate shall be enforceable, unless the agreement also provides that submission to arbitration shall not be a condition precedent to suit or action.

Va. Code Ann. § 8.01-577(B) (LexisNexis 2008). However, "a party cannot be compelled to arbitrate a question that is not arbitrable under the agreement between the parties." *Weitz v. Hudson*, 262 Va. 224, 228, 546 S.E.2d 732 (2001). This is because "[t]he extent of the duty to arbitrate, just as the initial duty to arbitrate at all, arises from contractual undertakings." *Id.* (quoting *Doyle & Russell, Inc. v. Roanoke Hosp. Assoc.*, 213 Va. 489, 494, 193 S.E.2d 662 (1973)).

In *Weitz*, one general partner sued the other, contending that the partner had "illegally converted . . . funds." *Id.* at 227. The partnership agreement contained an arbitration clause, so the defendant partner filed a motion to compel arbitration. The plaintiff claimed that the case was "just about the conversion or misappropriation of funds and that the arbitration clause d[id] not encompass intentional torts." *Id.* at 228. In addition, the plaintiff also contended that the dispute was not even between general partners at all, but rather was "between two individuals who were general partners in several partnerships, and involve[d] an act of revenge or 'self-help personal financial protection' by" one individual against the other. *Id.* The Virginia Supreme Court disagreed, holding that the arbitration clause, by which the parties had agreed to arbitrate " 'any dispute or controversy' that ar[ose] either 'under, out of, in connection with,' or 'in relation to' the partnership agreement," was very broad, and thus covered the allegation of illegal conversion. *Id.* at 228-29. The *Weitz* Court reasoned that this particular dispute was "related to" the partnership agreement, in that, in order "to resolve the controversy, [a

particular portion of the partnership agreement] w[ould] need to be construed or applied to determine whether [the defendant] converted the funds at issue or properly escrowed them." *Id.* at 229.

*Weitz* is not entirely on point, because in the instant case, Defendants have not pointed to a specific contract provision that would need to be construed or applied in order for this Court to determine the resolution of each specific count in DAC's complaint. In addition, *Weitz* does not address the issue as to whether non-signatories to a contract can compel arbitration via that contract's arbitration clause. What *Weitz* does demonstrate, however, is that, in Virginia, it is possible for an arbitration clause to apply to an intentional tort. For the resolution of the remaining issues, this Court finds federal case law, specifically that of the Fourth Circuit, to be very instructive.

### 2. *Federal Case Law*

In general, federal policy favors construing arbitration clauses as broadly as possible. *See, e.g., Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984) ("Doubts as to arbitrability should be resolved in favor of coverage . . . language excluding certain disputes from arbitration must be clear and unambiguous or unmistakably clear and . . . arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). For example, in *Long v. Silver*, 248 F.3d 309 (4th Cir. 2001), Plaintiff Long entered into an employment agreement in 1972 with a corporation. The employment agreement contained a broad arbitration clause. The *Long* Court applied the description "broad" to the following language:

> any and all disputes . . . arising out of or in connection with this Agreement, or with respect to the construction and interpretation thereof, or concerning the rights of any one or more parties hereto against any one or more parties hereto, or the respective obligations of each party hereto to each other party hereto, shall be determined by arbitration in accordance with . . . the then existing rules of the American Arbitration Association.

*Id.* at 313.

A subsequent "Shareholders' Agreement" was then entered into in 1999 by all the shareholders of the company, including Long. This Shareholders' Agreement also contained a broad arbitration clause. Long was thereafter fired, and he then sued the corporation, along with individual

officers of that corporation, for various claims stemming from both the employment and shareholder agreements, including breach of fiduciary duties, civil conspiracy, fraud, and unfair and deceptive trade practices, among other claims. *Id*. at 313-14. The corporation filed a motion to compel arbitration and stay the litigation. The United States Court of Appeals for the Fourth Circuit ultimately vacated and remanded the lower court's decision, which had denied the motion to compel arbitration, on the grounds that the lower court had applied the wrong test.

According to the *Long* Court, the correct test to apply when determining the scope of a broadly-worded arbitration clause is to ask whether "a *significant relationship* exists between the asserted claims and the contract in which the arbitration clause is contained." *Id*. at 316 (emphasis added). See also, *Genesco v. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987), in which the Second Circuit applied a similar test, which is as follows:

> In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters" covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them.

*Id*. at 846 (citation omitted). Applying this test, the Fourth Circuit determined that each and every one of Plaintiff's claims should be sent to arbitration, since there was in fact a significant relationship between each of the asserted claims and the agreements containing the arbitration clauses. For example, in determining whether the breach of fiduciary duty claim was arbitrable, the Court concluded that "[b]ecause Long would not have a valid breach of fiduciary duty claim *but for* the existence of the 1972 Agreement creating his status as a shareholder in the Corporation, we hold that Long's breach of fiduciary duty claim is properly referable to arbitration." *Id*. at 318 (emphasis added).

In addition, the *Long* Court addressed the issue as to whether non-signatories (which in *Long*, were the shareholders) to the 1972 employment agreement could nevertheless invoke the arbitration clause in that agreement. The Court held that the shareholders could in fact invoke the clause, since the "claims against the Corporation and its shareholders [we]re so closely intertwined that Long's claims against the non-signatory shareholders of the Corporation [we]re properly referable to arbitration even though the shareholders [we]re not formal parties to the 1972 Agreement." *Id*. at 320. In

addition, the *Long* Court reasoned that "[a]llowing Long to avoid the consequences of the 1972 Agreement while invoking its benefits in a suit against the shareholders would . . . disregard equity." *Id.*

In a later Fourth Circuit case, *American Bankers Ins. Group v. Long*, 453 F.3d 623 (4th Cir. 2006), the Court of Appeals considered another case involving the construction and application of a contractual arbitration clause. In *American Bankers*, Richard and Lillie Long were signatories to a promissory note that was incorporated into a "Subscription Agreement" that contained an arbitration clause. The Longs signed the note along with Thaxton Life Partners ("TLP"). After TLP filed for bankruptcy, the Longs sued American Bankers Insurance Group ("ABIG"), which was not a signatory to the Subscription Agreement, alleging eleven individual and class causes of action against ABIG. These included interference with contract, securities fraud, negligence, equitable subordination, civil conspiracy, unjust enrichment, respondeat superior, rescission, participation and alter ego, violation of the South Carolina Unfair Trade Practices Act, and aiding and abetting. *Id.* at 625. Essentially, the Longs accused ABIG of "participat[ing] in a scheme to defraud investors through the sale of worthless securities," specifically, that ABIG had persuaded TLP to offer worthless promissory notes to the public, knowing that TLP would never be able to pay these notes. *Id.*

ABIG filed a petition to compel arbitration against the Longs, arguing that the Longs should be equitably estopped from arguing that ABIG was not signatory to the contract containing the arbitration clause. *Id.* at 626. The *American Bankers* Court ultimately held that ABIG could in fact invoke the arbitration clause. The Court stated that there are two different tests that can be applied to determine when equitable estoppel applies against a signatory to an arbitration clause. The first test is as follows:

> Equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the . . . agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

*Id.* at 627 (citation omitted).

The second test, which applies to another type of estoppel, is as follows. "[E]quitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially

interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id*. at 627, n. 3. The Court explained that the "legal principle [underlying the theory of equitable estoppel] rests on a simple proposition: it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Id*. at 627 (quoting *Wachovia Bank v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006)).

The *American Bankers* Court applied the first test to the facts at hand and held that the Longs were equitably estopped from preventing ABIG from compelling arbitration. The Court reasoned as follows:

> Here . . . if TLP had never issued the Note, the Longs would have no basis for recovery against ABIG. Each of the Longs' individual claims – interference with contract, securities fraud and negligence, civil conspiracy, unjust enrichment and rescission, and violation of SCUTPA – are dependent upon their allegation that ABIG breached a duty created "solely by [the Note]," for without the alleged breach of the Note, the Longs would have no cause to complain. And although each of the Longs' individual claims is phrased in tort, the Longs "may [not] use artful pleading to avoid arbitration," because, at root, those claims attempt "to hold [ABIG] to the terms of [the Note]."

*Id*. at 630 (citations omitted).

## B. *Discussion*

Applying the above law to the instant facts, the Court first looks to the language of the arbitration agreement within the Subcontract itself. The actual arbitration provision is broad, since it states only that, "[i]n the event of dispute arising between the parties which cannot be resolved by good faith negotiations, upon 45 days prior written notice by either party, the dispute shall be submitted to arbitration." The language of this clause contains no limiting language, such as "arising from," or "relating to" the contract, etc. Rather, it simply states that in the event of a dispute between the parties, that dispute shall be submitted to arbitration. Thus, this is an extremely broad arbitration provision, since by its plain language, it requires that arbitration should apply to *any* dispute between the parties to this Subcontract.

Second, in resolving the question as to whether the non-signatories involved in the instant case, which include Chikar, Brantley, Chikar Trustee, Brantley Trustee, and Cotton, can compel arbitration, the Court looks to the

tests that were both described and applied in *American Bankers*. Applying either the first or second of the tests from *American Bankers*, it is clear that DAC should be equitably estopped from preventing any of the seventeen counts in its complaint from being arbitrated. Applying the first test from *American Bankers*, each count within DAC's complaint "presumes the existence of the [Subcontract]," and thus arises out of and relates directly to the Subcontract. Essentially, if DAC had never entered into the Subcontract with B2C, DAC would have no basis for recovery against any of the Defendants, just as the Longs in *American Bankers* would not have had any basis for recovery against ABIG if the Longs had never signed the note with TLP. Each of DAC's individual claims, for conversion, breach of fiduciary duty, fraud, etc., are dependent upon DAC's allegation that B2C breached a duty created by the Subcontract, for, without the alleged breach of the Subcontract, DAC would have no cause to complain. The Court further notes that, because of the agency relationship between B2C, Chikar, and Brantley, Chikar and Brantley are afforded the protections of the Subcontract's arbitration clause due to the fact that Chikar and Brantley are B2C's sole officers. *See General Electric Capital Corp. v. Union Corp Financial Group Inc.*, 142 Fed. Appx. 150, 153 (4th Cir. 2005).

Also, the Court notes that the second test from *American Bankers* applies specifically to those counts within the complaint that DAC filed against Cotton, in that DAC raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory (here, Cotton) and the signatories to the contract (here, B2C), in that DAC alleges that Cotton falsely claimed that he was assuming B2C's liabilities. Thus, equitable estoppel is specifically warranted regarding DAC's claims against Cotton.

In addition, just as the *Long* Court held that the non-signatory shareholders in that case could in fact invoke the arbitration clause, since the "claims against the Corporation and its shareholders [we]re so closely intertwined," so this Court finds that the non-signatory defendants here should be able to invoke the Subcontract's arbitration clause, since each of the claims against B2C, Chikar, Brantley, Chikar Trustee, Brantley Trustee, and Cotton are so closely intertwined.

Third, the Court finds that the Subcontract's arbitration clause encompasses all counts within DAC's complaint, including each of the intentional torts, and not just those claims involving breach of contract. That is because, applying the *Long* Court's test, there is in fact a "significant relationship" between each of the seventeen counts within DAC's complaint, and the Subcontract, in that, *but for* the existence of the Subcontract, DAC would not have a basis upon which to bring its various claims against the Defendants.

## IV. *Conclusion*

For all of the reasons stated above, the Court grants Defendants' Motion to Compel Arbitration. The Court further grants Defendants' Petition for a Stay Pending Arbitration, pursuant to Va. Code § 8.01-581.02(D), which states, "[a]ny action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section."